# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN GUTHRIE,<br><br>                                   Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON, Secretary of the California Department of Corrections and Rehabilitation,<br><br>                                   Respondent. | Case No.:  3:19-cv-1452-WQH-AHG<br><br>**REPORT AND RECOMMENDATION RECOMMENDING THE COURT DENY THE HABEAS PETITION**<br><br>**[ECF No. 1]** |

Petitioner Ian Guthrie, a state prisoner proceeding *pro se*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCD258303. ECF No. 1. Respondent Kathleen Allison ("Respondent") filed an Answer to the Petition on March 19, 2020, and Petitioner filed a Traverse on June 11, 2021. ECF Nos. 13, 26. For the reasons outlined below, the Court **RECOMMENDS** that the District Judge **DENY** the Petition.

## I.     PROCEDURAL BACKGROUND

A jury in San Diego Superior Court found Petitioner guilty of first-degree murder on May 19, 2016, and he was sentenced to 50 years to life, plus another consecutive five years due to a serious prior felony enhancement stemming from a 1997 manslaughter conviction in New York, amounting to a minimum of 55 years to serve, on

August 12, 2016. ECF No. 1 at 1; Lodgment ("Lodg.") at 948, 4374.[1] Petitioner and his co-defendant Dion Chambers, a/k/a Peter Johnson (hereinafter "Chambers")[2] appealed their convictions to the California Court of Appeal, which affirmed the judgments in nearly all respects[3] on February 5, 2019. ECF No. 1 at 2; Lodg. 5004-64. Shortly thereafter, both Petitioner and his co-defendant Johnson appealed to the California Supreme Court, which denied their petition for review and affirmed the judgments against them on April 10, 2019. *Id*.

Petitioner filed his first petition for writ of habeas corpus on August 1, 2019, commencing the present action. ECF No. 1. Respondent filed an Answer to the Petition on

---

[1] The Notice of Lodgment and accompanying Lodgment in this case comprise 49 separate .pdf documents, together totaling 5067 pages. *See* ECF No. 14. All citations to "Lodg." are to the corresponding page number of a consolidated PDF of the 49 documents in order from ECF No. 14 – ECF No. 14-48, i.e., to the specific page within the 5067-page lodgment, as though it is a single document.

[2] Petitioner was tried jointly for the murder along with co-defendant Dion Chambers, but with separate juries. Both defendants were convicted of first-degree murder, and Chambers received an additional 25-year firearm enhancement after his jury found that Chambers intentionally and personally discharged a firearm during the commission of the murder, causing death. Although Chambers was referred to by the alias "Johnson" in the California Court of Appeal's opinion below, the Court refers to him as "Chambers" herein, as that was the primary name used for him throughout trial.

[3] The only aspect of the judgment against Petitioner that was not affirmed pertained to his five-year sentencing enhancement. The Court of Appeal remanded the action to allow the superior court to consider whether Petitioner's serious prior felony enhancement should be stricken in light of an amendment to the California Penal Code that took effect after Petitioner had already been sentenced, and which granted trial courts discretion at sentencing to strike five-year prior serious felony enhancements in "furtherance of justice." Lodg. 5061-64; *see also* Cal. Penal Code §§ 667(a); 1385(c)(1). The Court of Appeal also remanded the case to allow the Superior Court to consider whether Chambers' firearm use enhancement should be stricken on the basis of a similar amendment to the California Penal Code that took effect after the trial. *See* Lodg. 5060-64; Cal Penal Code § 12022.53(h). Upon remand, on August 16, 2019, the trial court denied Petitioner's motion to strike the serious felony enhancement and affirmed Petitioner's original sentence. Lodg. 5067.

March 19, 2020, and lodged the State Court Record the same day. ECF Nos. 13, 14. Following numerous extensions due to the COVID-19 pandemic and Petitioner's limited access to the law library, Petitioner timely filed his traverse on June 11, 2021.

## II.   STATE COURT FACTUAL DETERMINATIONS

Pursuant to 28 U.S.C. § 2254(e)(1), the Court must presume any "determination of a factual issue made by the State court" to be correct, and Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. Because the underlying factual determinations are relevant to Petitioner's grounds for habeas relief, the Court will recite the facts as set forth in the published opinion of the California Court of Appeal in *People v. Johnson, et al.*, 243 Cal. Rptr. 3d 586, 595-99 (Cal. Ct. App. 2019), in their entirety:

> [Lamar] Canady was murdered by a gunman in his barbershop in broad daylight at approximately 11:30 a.m. on May 9, 2014. The prosecution contended [Omar] Grant, who led a drug trafficking operation, plotted revenge against Canady for stealing marijuana and sleeping with Grant's girlfriend, Talya Martin, over a year before the murder. According to prosecutors, Grant commissioned defendants Johnson [a/k/a Dion Chambers] and [Petitioner Ian] Guthrie, and other uncharged and unknown individuals, to murder Canady.
>
> Investigative efforts after Canady's murder showed Johnson, a Jamaican citizen who resided in Kansas City, Missouri before the crime, began using a prepaid cell phone, or "burner," on April 15, 2014. Phone records showed Johnson activated the burner phone in Houston, Texas, that day, and that he was in San Diego by April 20th. The first name and phone number entered as a contact on the phone was Guthrie's. Guthrie also purchased multiple burner phones on May 5, 2014. Phone records revealed that Guthrie was in the area where Canady was shot and was in contact with Johnson on May 8, 2014.
>
> May 9, 2014, the day Canady was killed, Guthrie called Grant around 9:18 a.m. Cell phone data showed Guthrie calling Johnson a few minutes later, then both men's phones moving toward the neighborhood where Canady's barbershop was located until Guthrie and Johnson were both in the area just minutes before the shooting. Around 11:00 a.m., the security cameras at the Trade Winds liquor store directly west of the barbershop captured Johnson walking down the street and entering the liquor store.

3

At that time, Canady was next door in the barbershop with one of his barbers, Pride Erving. Both Canady and Erving were known members of the West Coast Crips gang. Security footage from an auto repair business across the street from the liquor store, Nu's Auto Repair & Body Shop, showed Guthrie and a man in khaki pants standing near a silver sedan parked across from the barbershop. At one point in the video, Guthrie is seen raising his arms, hopping and shadow boxing.

At 11:22 a.m., Canady briefly walked outside the barbershop then reentered. Phone records showed Guthrie called Johnson within seconds of Canady returning inside the barbershop. The owner of the liquor store reported to the police that Johnson purchased a 40-ounce beer before leaving, and the time-stamped video footage from the store showed Johnson walking to the cash register after the call from Guthrie to purchase beer, then exiting the store at 11:24 a.m. At about the same time, a red SUV with a spare tire on the back of its lift gate proceeded down the street in the same direction as Johnson was walking.

As Johnson exited the liquor store, video from the auto shop showed Guthrie opening the silver sedan's trunk. The video then showed Guthrie's companion, referred to at trial as the man in khaki pants,[4] walk toward the silver sedan's open trunk and grab something from within. As Johnson exited the store, he and the man in the khaki pants walked towards each other, then the man in the khaki pants crossed the street toward Johnson and handed Johnson the item retrieved from the trunk in exchange for the bag containing the beer Johnson purchased at the liquor store. Prosecutors contended the man in the khaki pants exchanged the murder weapon for the beer Johnson purchased. Once the handoff was complete, the man in the khaki pants returned to the silver sedan and entered the passenger side of the vehicle.

[FN 4: The man was never clearly identified at trial.]

The time-stamped video surveillance showed Johnson entering the barbershop at approximately 11:25 a.m. and exiting within seconds. In that short time, Johnson fired 14 shots, 10 of which hit Canady's head, face, torso, and legs. The video surveillance showed Johnson quickly leaving the shop, tucking the gun in his waistband, and running east, away from Guthrie and the man in khaki pants who had remained in the silver sedan. As soon as Johnson exited the barbershop, simultaneous video surveillance showed the sedan with Guthrie and the other accomplice inside driving away from the scene.

An employee of the auto shop, who was across the street from the barbershop at the time shots were fired, testified that he saw a man "turn real quick around the corner" while running away from the barbershop. The witness did not see if Johnson had a gun, but did recall something glinting off Johnson's back that appeared to be shaped "like a gun handle in back." The red SUV then circled the area, followed Johnson's movements and, according to a detective who analyzed the video surveillance, likely picked Johnson up. Johnson was also seen on video footage raising an arm to talk on the phone.

The silver sedan, driven by Guthrie, pulled away from the curb where it was parked, then drove east away from the barbershop, made a U-turn and paused in front of the barbershop for almost a minute before driving away. Cell phone records showed Guthrie called Grant at 11:35 a.m. from an area just outside of the neighborhood where the shooting occurred.

Meanwhile, Erving exited the barbershop and was seen outside panting heavily and struggling to catch his breath. Erving entered the liquor store, and a customer called 911 to report the shooting and eventually put Erving on the phone, who reported to the dispatcher that his friend had been shot 15 times. Erving also called his friend, Mark Ritchey, in a panic and asked Ritchey to come pick him up. When Ritchey arrived, Erving was distraught and frantic.

San Diego Police Officer David Beathard was the first law enforcement official to arrive at the scene. Erving flagged Beathard down and exclaimed, "He is gone. They shot him like 15 times." Beathard entered the barbershop and found Canady lying on the floor in a pool of blood. Canady was pronounced dead at the scene and investigators found 14 cartridge casings, all fired from the same nine-millimeter Glock pistol.

Erving spoke with another officer about the shooting at the scene and consented to being swabbed for gunshot residue, photographed, and patted down. Once officers asked Erving to go back to police headquarters, however, he refused to answer any additional questions or cooperate further, and made himself unavailable to testify at trial.

An autopsy revealed Canady suffered 10 gunshot wounds, four to the front of his body and six to the back. One of the bullets entered the back of Canady's head and exited the left side of the top of his skull. That bullet was fired from a closer distance than the other bullets, likely 12 inches or less from Canady's head.

3:19-cv-1452-WQH-AHG

Officers eventually learned Johnson was in the Trade Winds liquor store next door to the barbershop immediately before the shooting, and his DNA and fingerprints were obtained from two beer cans in the liquor store that he had handled, but did not purchase. Police recovered surveillance video from the liquor store and the auto shop.

Police used the clothes Johnson was wearing—a dark blue American Eagle shirt with an "A-Eagle" emblem, a baseball cap, dark pants, a dark-colored wristwatch with a large face, and white Adidas shoes with black stripes—to identify him as the person who bought the beer and entered the barbershop immediately before the shooting. Once Johnson was identified, within weeks of the shooting San Diego police, with assistance from the FBI, requested a "cell tower dump" from major wireless carriers and used that data and the time of his call to Guthrie while in the liquor store to ascertain the numbers of the phone Johnson used, (832) 885-1563, and the phone Guthrie used, (619) 577-0114.

The cell phone records revealed that immediately after the shooting Guthrie's and Johnson's cell phones traveled from near the barbershop to a one block area on Via Monzon in the Rancho Peñasquitos neighborhood. Subpoenaed records for those phones also revealed that Guthrie's phone received or made over 100 calls from various Jamaican prefixes from May 8, 2014 to May 11, 2014. Cell phone records also revealed that on May 13, 2014, Johnson traveled from San Diego to Denver to Baltimore.[5]

[FN 5: Police later confirmed that Johnson flew this route using information obtained from United Airlines.]

Johnson's phone was eventually traced to Kansas City, Missouri. On August 13, 2014, San Diego authorities informed FBI officials in Kansas City that they had a search warrant to track and trace the phone they believed Johnson was carrying there. Local authorities obtained phone records identifying the home where Johnson was staying and conducted surveillance for several days on the residence, eventually arresting Johnson on August 27, 2014, outside the home. When Johnson was arrested, he had the American Eagle shirt, watch, and Adidas shoes he wore the day of the shooting in his possession. Authorities also found his burner phone, which had Guthrie's phone number as the first phone number recorded in the phone's list of contacts.

On August 27, 2014, San Diego Police Officer Jim Jones interviewed Johnson in Kansas City. When shown a picture of Guthrie, Johnson told Jones that he was not sure if he knew Guthrie. Johnson admitted to shooting Canady, but

denied that anyone else was involved with the crime. Johnson told Jones that the "support at the scene" that the video surveillance showed were just kids who wanted liquor.

Guthrie's phone was eventually traced back to a residence on Via Monzon, where officers conducted surveillance and saw Guthrie using the phone. After identifying Guthrie, San Diego police officers conducted a traffic stop and Guthrie produced a Florida driver license with the name Devon John. Officers later obtained a warrant to search the Via Monzon residence and discovered that it was being used as a marijuana stash house. The search of the house uncovered significant marijuana residue and packaging, a Taurus handgun, two extended round magazines, packaging materials, scales, fake identification cards, passport photos of multiple individuals, pay/owe sheets, tables with cuts on them, and multiple cell phones, one of which contained Guthrie's DNA. Officers also learned the house was leased to Talya Martin.

The same day that Johnson was arrested in Kansas City, San Diego police officers executed the search warrant for the Via Monzon house and arrested Guthrie, who was there. Guthrie was taken into custody and interviewed at the homicide office of the police department headquarters. Guthrie initially claimed to be Mike Smith from Brooklyn. When the officers showed photos of the crime scene and Johnson to Guthrie, he first denied being in the area or knowing anything about the shooting. He told the interviewing officers he was staying at the Via Monzon address because the person who lived there, Talya Martin, was vacationing.

Eventually, Guthrie admitted his real name. He insisted he lied about his name only because he entered the United States illegally in 2013. He also eventually admitted the Via Monzon house was used for packing marijuana and that he served as the "middle man" or runner for Grant. When shown a photo of Johnson again, Guthrie admitted he recognized him, knew him as "Boom," and that he bought 20 pounds of marijuana from him. Guthrie then changed his story, and said he was the seller and that he sent or gave weed to Johnson. Guthrie also told officers he bought the phone that he used to communicate with Johnson.

Guthrie eventually admitted that he knew more about Canady and the shooting, but told police he did not want to provide more information because he feared for the safety of his family in Jamaica. He admitted he and Johnson worked for Grant, who was also known as Razor. Guthrie maintained he was not involved in the shooting, but told officers Grant was upset with Canady for stealing Grant's marijuana and sleeping with Grant's girlfriend, Martin.

Guthrie also eventually admitted to being in the neighborhood where the shooting occurred, but claimed he was there to sell marijuana. When confronted with records of cell phone calls between him and Johnson, Guthrie stated the calls all related to drug deals.

Law enforcement also interviewed Martin, who initially told police she would not cooperate. The prosecutor, however, entered an immunity agreement with her. At trial, she told the juries that she and Grant, whom she called Razor, were in an on and off again relationship for several years. She did not live with Grant, but Grant paid for her apartment, car, clothing, purses, and all of her other expenses. In exchange, Martin would run errands for Grant, including receiving wired money, exchanging cash for prepaid credit cards, using fake identification to open post office boxes and retrieve packages, and renting houses for Grant, including the one on Via Monzon. Martin testified that she never lived at that house, but Guthrie did.

Martin was introduced to Guthrie by Grant, who referred to Guthrie as his family. She knew Guthrie as Shawn and by the nickname "Boxer" and one of her friends, Claudia Ambrose, formed a relationship with Guthrie around 2013. Martin testified that she and Grant would socialize with Guthrie and Ambrose regularly, including going on trips and frequent double dates.

Martin testified that in 2012 and 2013, she was also seeing Canady. At one point during this relationship, Martin agreed to store six storage bins of marijuana in her apartment for Grant while Grant was out of town. Martin stated that in the same timeframe, approximately a year before Canady's death, Canady occasionally stayed with Martin at her apartment, including when the marijuana was stored there. On the last occasion that Canady stayed the night, Martin woke up in the morning to find both Canady and the bins of marijuana gone. Martin called Canady, who denied taking the marijuana. Martin eventually told Grant what had happened, including that she had been in a relationship with Canady. Martin testified that she and Grant continued to be in a relationship for several years after the incident.

Martin testified she learned through social media that Canady had been killed. Martin did not suspect Grant was involved in the killing because two years had passed since Canady had stolen the bins, and because her relationship with Grant was going well. Several months later, in August 2014, Martin learned about the search warrant served at the Via Monzon house. At that time, she was in Jamaica with Grant. Martin had planned to return to San Diego the day after they learned of the search warrant, but she extended her

trip for another three months. Martin also testified that Grant never returned to the United States from Jamaica and was murdered there on April 2, 2015.

## III.   DISCUSSION

In the petition, Petitioner raises five grounds for relief: (1) Petitioner's statements during a police interview were obtained in violation of his *Miranda* rights, because he invoked his right to counsel and the interviewing officer continued the questioning without providing Petitioner counsel; (2) that the evidence presented at trial to establish Petitioner's culpability of aiding and abetting the murder was wholly circumstantial and insufficient as a matter of constitutional due process; (3) that the trial court erred by admitting evidence of Petitioner's status as an undocumented immigrant as well as his uncharged criminal conduct of using false identification documents to enter the United States and engaging in a marijuana distribution operation; and (4) that the trial court erred by admitting irrelevant and unduly prejudicial evidence of rap lyrics written by the murder victim. As a fifth ground for relief, Petitioner also argues the cumulative prejudice of all of these errors amounted to a denial of due process. Petitioner's arguments in support of his petition for writ of habeas corpus are the same as those he raised on appeal to the California Supreme Court, although he also raised an additional argument there regarding the trial court's denial of his motion to continue the sentencing hearing to allow him to conduct additional discovery to determine whether investigators used a technology called a cell site simulator to locate him, an issue which he does not raise here. *See* Lodg. 5004-64.

The Court will address each of these five grounds in turn.

### A.   Ground 1 – whether the state court erred in finding that Petitioner did not unambiguously invoke his right to counsel under *Miranda*

Petitioner first argues that the trial court erred in denying his motion to suppress statements made during his custodial interview with police following his arrest, on the basis that the statements were obtained in violation of his *Miranda* rights. Petitioner contends that he unambiguously invoked his right to counsel during the interrogation, but the

interviewing officers improperly continued to question him, and thus all statements made after his invocation of the right to counsel should have been suppressed.

### i.   Legal Standard

Pursuant to 28 U.S.C. § 2254(d), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." As is apparent from the language of the statute, the first prong of this provision applies to questions of law, while the second prong applies to questions of fact. Nonetheless, "the proper characterization of a question as one of fact or law is sometimes slippery." *Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995). A claim of a *Miranda* violation presents "mixed questions of law and fact," which are reviewed *de novo* as though they are questions of law. *Lujan v. Garcia*, 734 F.3d 917, 930 (9th Cir. 2013). The Supreme Court has also stated that an issue such as "the voluntariness of a confession" has a "uniquely legal dimension[,]" and the Court has thus categorized it as a "question[] of law for § 2254(d) purposes." *Thompson v. Keohane*, 516 U.S. 99, 99–100 (1995).

Nonetheless, although an alleged *Miranda* violation raises a "question of law for § 2254(d) purposes," the Supreme Court has made clear that inquiries into questions of law under § 2254(d)(1) remain subject to a reasonableness inquiry—that is, the question before the Court is not whether the trial court's application of federal law was incorrect, but whether it was unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 410-11 (2000). As the *Williams* Court explained:

> The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. . . . [T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s

"unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* (emphasis in original). *See also, e.g.*, *Hart v. Broomfield*, No. CV 05-03633 DSF, 2020 WL 4505792, at *84 (C.D. Cal. Aug. 5, 2020) (explaining, in its analysis of a similar *Miranda* claim involving whether the petitioner invoked his right to an attorney during questioning, that its review of the state court decision "is stringently limited to determining whether that court drew an objectively unreasonable conclusion under *Miranda* and its progeny.") (citing *Harrington v. Richter*, 562 U.S. 86, 101 (2011) and *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017)).

Therefore, under the "unreasonable application" clause of § 2254(d)(1), the Court may grant Petitioner's application "if the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions"—here, *Miranda* and its progeny—"but unreasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Where, as here, the state supreme court denies review of the habeas petition without comment, the Court must "look to the last reasoned state-court decision"—here, the decision from the California Court of Appeal—in conducting its reasonableness analysis. *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003).

### ii. *Relevant Factual Background*

Petitioner was interviewed by Sergeant Greg Flood and Detective Gary Avalos of the San Diego Police Department on August 27, 2014. Lodg. 96-250. Video footage of the interview was played for the jury. Lodg. 5039.

After some initial questioning regarding Petitioner's identity (he had been using a false name), Detective Avalos provided the requisite *Miranda* warnings to Petitioner, including but not limited to advising Petitioner of his right to remain silent, his right to

speak with an attorney of his choice before questioning, and his right to have the attorney present during questioning, as well as the right to have an attorney appointed for him by the court prior to any questioning if he could not afford an attorney. Lodg. 109-10. After advising Petitioner of his rights, Detective Avalos asked, "Do you understand each of these rights that I explained to you?" Petitioner responded, "Yes sir." *Id.* at 110. The colloquy continued as follows:

> AVALOS:   Okay. Having in mind and understanding your rights as I have told you are you willing to talk to me?
> GUTHRIE: Yeah. . . I, I
> AVALOS: Okay.
> GUTHRIE: . . . yeah cause I want to, I want to know about what this is about?
> AVALOS: Absolutely.
> GUTHRIE: Yeah.

*Id.* Following this exchange, both officers continued questioning Petitioner for approximately thirty minutes. The officers' initial questioning was focused primarily on pressing Petitioner to admit that he was at the scene of the murder and stating that they had a photo of him at the scene. Once that topic was raised, the following exchange ensued, during which Petitioner made certain statements (bolded for emphasis below) that his trial counsel later argued should have been treated as unambiguous invocations of his right to counsel, thus requiring the officers to cease the interrogation:

> FLOOD: Well, you were there.
> GUTHRIE: No, I wasn't.
> FLOOD: Yes, you were.
> GUTHRIE: No, I wasn't, sir.
> FLOOD: And we're not gonna argue. You were there.
> GUTHRIE: Then charge me, sir. **A lawyer, a lawyer.**[4]
> FLOOD: Well…
> GUTHRIE: Yeah.

---

[4] The transcript indicates that at this point, Petitioner stated, "I, I can get a lawyer." ECF No. 14-1 at 126. However, as noted by the California Court of Appeal, the statement was mis-transcribed and he actually stated, "A lawyer, a lawyer." *Johnson*, 243 Cal. Rptr. 3d at 611 n.11.

FLOOD: …here's…

GUTHRIE: Yeah.

FLOOD: …here's the, I mean do you want to talk to a lawyer?

**GUTHRIE: Yeah, yeah. Do, do I, if anything…**

FLOOD: We want to continue to talk to you. Do you want to continue to talk to us or do you want to talk to a lawyer?

GUTHRIE: Listen, listen. If you're gonna charge me, charge me. If not, let me go. Or, or call I, Immigration and say I'm here illegally.

FLOOD: Well, you're under arrest right now.

GUTHRIE: Yeah.

FLOOD: So, you understand that.

GUTHRIE: Yeah.

FLOOD: Okay.

GUTHRIE: Okay, okay. You, you, but you read me my rights, but what I under arrest for?

FLOOD: Right now you're under arrest for murder.

GUTHRIE: Me?

FLOOD: Yes. That's why we want to talk to you because we know that this guy's the one that fired the rounds.

GUTHRIE: Yeah.

FLOOD: But you were there and we need to find out why you were there and what your involvement with this was.

GUTHRIE: I, I don't know him! I don't know him, man!

FLOOD: You were there.

GUTHRIE: I don't know him. Wh-what are you trying to say, say, say I seen something…

FLOOD: Okay.

GUTHRIE: …or whatever?

FLOOD: I don't know. That's why we're…

GUTHRIE: I don't know nothing.

FLOOD: …talking to you.

GUTHRIE: I don't, I don't know, I don't know.

AVALOS: But you're saying you don't know him.

GUTHRIE: I don't know him.

AVALOS: You don't know him, Ian, you don't know him…

GUTHRIE: Yeah.

AVALOS: Tell us what you were doing there?

GUTHRIE: I wasn't there. I, if I, I was never there standing. If you see me across the street standing up.

FLOOD: And you were talking to this guy at one point.

GUTHRIE: Standing across the street talking?

AVALOS: Yes.

GUTHRIE: Okay. Charge me.
FLOOD: You don't want to tell us why you were there?
GUTHRIE: I, I was never there. I was never there. I…swear on my life if I was never there. I was never there. I don't know this dude.

Lodg. 130-32.

The interview then continued for over another hour. Lodg. 5040. During the remainder of the interview, Petitioner eventually admitted he was involved with drug sales with Omar Grant, and provided information about Mr. Grant's motive for the killing, telling the officers that the murder victim had robbed Mr. Grant and slept with his girlfriend years earlier, leading Mr. Grant to seek revenge. Petitioner later moved the trial court judge to exclude all evidence of his interview with police and to suppress all statements made subsequent to his purported invocation. *See* Lodg. 708-13. The trial judge permitted oral argument on Petitioner's motion to suppress on April 15, 2016, during a motion in limine hearing, and ultimately denied it on the basis that Petitioner's statements did not amount to an invocation of the right to counsel. Lodg. 1330-43.

### iii.   Analysis

Here, the undersigned recommends the Court find the state court did not unreasonably apply the principles of *Miranda* and its progeny in finding that Petitioner did not unambiguously invoke his right to counsel during questioning by police.

The applicable federal law draws a distinction between post-waiver invocations of the right to counsel and pre-waiver invocations. Specifically, the Supreme Court has held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461 (1994). Any such request following an initial knowing and voluntary waiver must be "unambiguous and unequivocal." If the statement "is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62. Nor are officers required to ask clarifying questions in the face of a post-waiver ambiguous or equivocal request for counsel. *Id.* at 461.

14

In the context of a post-waiver invocation, a statement is considered ambiguous—and thus does not require the cessation of questioning—if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel[.]" *Id.* at 459. However, officers are required to cease further questioning in the face of an *unambiguous* request for counsel or refusal to talk. *People v. Cruz*, 187 P.3d 970, 995 (Cal. 2008) (citing *Davis*, 512 U.S. at 458-60)). "Although a suspect need not 'speak with the discrimination of an Oxford don,' [] he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.

Before the trial court, Petitioner's trial counsel argued that the interview should have ceased after Petitioner stated "Yeah, yeah. Do, do I, if anything" in response to Sergeant Flood's question, "[D]o you want to talk to a lawyer?" Counsel made the same argument to the trial court that Petitioner makes now:

> Counsel: The invocation for a lawyer, the magic elixir word, and then the 'yeah' after it, that's the bright-line cutoff point. And whether it is in the middle of an interview or whether it is at the beginning of an interview, that's the magic elixir word, if you will. That is what he has to say. And he says it.
>
> They override it. Then he tries in vain on several other attempts to use, 'Charge me.' 'Take me to court,' he says on a few occasions. But I think it is critical the body language where he turns around and away from them at these points, and they just keep going.
>
> So here he is a criminally accused. He doesn't have the sophistication of law enforcement. They know that maybe on voluntariness issues and *Miranda* for other issues it can be gentler, if you will, or less strict for them later in the interview. But not the lawyer request. That is a magic cutoff regardless of where it happens.
>
> And he makes that. They don't just say 'Okay.' They try to clarify with him and they ask, 'Hey, do you want a lawyer?' Because they are thinking, 'Oh, no. He has said it.' And then he says, 'Yeah.' And they go, 'Well, you are not really clear on that. You don't really want one.' And then they keep going.
>
> Asking for a lawyer is the bright-line rule. And we override here.

Lodg. 1339-40. Additionally, Petitioner's counsel argued that a statement he made a few minutes later in the interview, "I'm, I'm not speaking no more man" should have

alternatively been treated as an invocation and triggered the cessation of the interview at that point. *See* Lodg. 134, 1342.

The trial court judge rejected the argument and denied the motion to suppress based on the following rationale:

The Court: Thank you.

I think the starting point is the finding that I have made that he did make an original valid waiver at the beginning of the interview. That being the case, it sets the status quo, so to speak. The status quo is that he is a person who has waived his rights.

That being the case, the burden is on him to make an unequivocal, unambiguous assertion of those rights in order to revoke that waiver. And I think it is true that the officers are not required to ask clarifying questions at that point, although there is nothing to prevent them from doing so.

In this case, on page 36, line 4—line 3, Detective Flood makes the assertion, 'You were there.' And Mr. Guthrie says, 'Then charge me. I can get a lawyer.' That's not an invocation. That's not a request for a lawyer. He is just saying, 'If you charge me, I can get a lawyer then.'

Now, we go further down, and Detective Flood says, 'Here's the—' And I assume he was going to say or my memory is something like, 'Here's the deal or here's the situation. I mean do you want to talk to a lawyer?' And here Mr. Guthrie says, 'Yeah, yeah. Do, do I, if anything.'

And then Sergeant Flood says, 'We want to continue to talk with you. Do you want to continue to talk with us, or do you want to talk to a lawyer?' And that would have been the perfect place for him to say, 'I want a lawyer.' But he didn't.

What he said was, 'Listen, listen, if you are going to charge me, charge me. If not, let me go. Or call immigration and say I am here illegally.'

And then Sergeant Flood says, 'Well, you are not going to be let go. You are under arrest. What are you under arrest for? You are under arrest for murder.' So he knows that.

And then Sergeant Flood says, 'That's why we want to talk to you.' And then Mr. Guthrie keeps talking.

I conclude, as a matter of law, that that was not an invocation, even the 'Yeah, yeah' was not an invocation. I think that's borne out by the way they appear on the tape. And to the extent that that argument is asserted that the interrogation at to stop at that point, I conclude otherwise.

Lodg. 1340-42.

The trial court judge also rejected Petitioner's argument that his later statement "I'm not speaking no more man" should have been treated as an invocation:

> The fact is this is page 39 of a 159-page transcript. So he does keep talking. I think that [the prosecutor's] observation is a significant one. He keeps talking because he wants to sell his version of what's going on here. That to me seems to be . . . an indicator that it is voluntary. He, in fact, keeps speaking. He does not invoke. And I think he does so in order to try to get himself off the hook and to explain some of the inconvenient evidence against him. I don't find that [the statement "I'm, I'm not speaking no more man"] was an invocation either, and the motion to suppress on *Miranda* grounds is denied.

Lodg. 1342-43.

As discussed, the Court must look to the "last reasoned" state court opinion on this issue from the California Court of Appeal in making its reasonableness determination on habeas review. First, the appellate court agreed with the trial court "that [Petitioner's] statements to Avalos and Flood after he initially waived his right to counsel did not constitute an invocation of his right to counsel and against self-incrimination." *Johnson*, 243 Cal. Rptr. 3d at 613. Indeed, Petitioner did not contest the trial court's finding of an initial waiver on appeal. *Id.* Therefore, Petitioner was required to "unambiguously request an attorney" in order to invoke his right to counsel during the interview. *Id.* The California Court of Appeal found he failed to do so, supplying the following rationale:

> Approximately 30 minutes into the close to two and a half hour interrogation, Guthrie grew frustrated with the officers' repeated accusation that he was at the scene of the crime. In response to their repeated statements that they knew Guthrie was near the barbershop when the shooting occurred, Guthrie stated in a frustrated tone, "Then charge me, sir. A lawyer, lawyer." To clarify if Guthrie was invoking his right to representation, Flood asked a follow-up question, "[D]o you want to talk to a lawyer?" Guthrie responded by saying, "Yeah, yeah. Do, do I, if anything. ..." This statement was objectively ambiguous because from the start of the interrogation, Guthrie responded to almost every statement and question posed by Avalos and Flood by saying, "yeah, yeah."
>
> Flood, reasonably, then sought further clarification, stating, "We want to continue to talk to you. Do you want to continue to talk to us or do you want

to talk to a lawyer?" Guthrie again did not unambiguously invoke his rights, stating only, "If you're gonna charge me, charge me. If not, let me go. Or, or call ... immigration and say I'm here illegally." Flood explained that Guthrie was under arrest and that he was being charged with murder. The interrogation then continued without any further statement from Guthrie about his rights.

Guthrie contends that his statement, "[y]eah, yeah," to Flood's first question was an unambiguous invocation of his rights. We disagree. The trial court's finding that the statement was ambiguous was supported by the evidence before the court. Because of Guthrie's speech patterns, specifically his habit of stating "yeah, yeah" in response to most of the questions Avalos and Flood asked, it was reasonable for the officers to understand only that Guthrie might be invoking his right to assistance of counsel and to seek further clarification. [*People v.*] *Williams*, [233 P.3d 1000, 1019 (Cal. 2010)]. Guthrie then failed to signal a clear request for a lawyer and the interrogation properly continued. The trial court's denial of Guthrie's motion to suppress was not error.

*Id.*

The California Court of Appeal's rationale was not an unreasonable application of the governing constitutional principle to the facts of Petitioner's case, as required to grant habeas relief. Given Petitioner's undisputed initial waiver at the outset of the interview, under the applicable constitutional law, Petitioner was required to make an unequivocal, unambiguous assertion of his right to counsel to invoke the right and bar further questioning. Both the trial judge and Court of Appeal correctly identified the legal principle governing post-waiver invocations of the right to counsel. Applying that principle to the case, the trial judge determined that Petitioner failed to make an unequivocal, unambiguous assertion of his right to counsel due to (1) the equivocal nature of the statement "Then charge me, sir. A lawyer, a lawyer [or, as it was understood by the trial court, 'I can get a lawyer']" (2) Petitioner's failure to affirm that he wanted a lawyer in response to Sergeant Flood's clarifying question, "Do you want to talk to a lawyer?" and (3) Petitioner's decision to continue talking to the officers for at least an hour following that exchange.

Similarly, the California Court of Appeal found that Petitioner's statement of "Yeah, yeah. Do, Do I, if anything . . ." in response to Detective Flood's question, "Do you want to talk to a lawyer?" was "objectively ambiguous because from the start of the

interrogation, Guthrie responded to almost every statement and question posed by Avalos and Flood by saying, 'yeah, yeah.'" *Johnson*, 243 Cal. Rptr. 3d at 613. Therefore, the Court of Appeal held that "[t]he trial court's finding that the statement was ambiguous was supported by the evidence before the court" because "it was reasonable for the officers to understand only that Guthrie might be invoking his right to assistance of counsel and to seek further clarification." *Id.* This analysis is a reasonable application of the Supreme Court's holding in *Davis* that, in the context of a post-waiver invocation, a statement is considered ambiguous if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel[.]" 512 U.S. at 461.

As for Petitioner's statement that he was "not speaking no more man," the trial court also reasonably applied the principles of *Miranda* and its progeny to the facts of Petitioner's case, finding that Petitioner's decision to continue speaking both immediately after making that statement as well as in response to further questions indicates that his statements are voluntary. *See Thompkins*, 560 U.S. at 386 (answering questions is a "course of conduct indicating waiver" of the right to remain silent).

Therefore, the undersigned recommends that the Court reject Petitioner's first ground for habeas relief.

**B.    Ground 2 – whether the evidence presented at trial to support Petitioner's conviction for aiding and abetting murder was insufficient as a matter of law**

Next, Petitioner contends that the evidence presented by the prosecution at trial was wholly circumstantial and was not sufficient to support a conviction for aiding and abetting murder, as a matter of constitutional due process.

*i.    Legal Standard*

The Due Process Clause of the Fourteenth Amendment protects defendants from being convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The Supreme Court has explained that this holding in *Winship* "presupposes

as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof— defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In evaluating a habeas petition that challenges the sufficiency of the evidence supporting the petitioner's state-court conviction, the "critical inquiry" for the federal court on review is "to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318. Importantly, this inquiry "does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19 (internal quotations and citations omitted). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16; *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004).

The Court's obligation to view the evidence in the light most favorable to the prosecution is intended to respect and preserve the jury's role as the finder of fact, who is presumed to have fairly resolved all conflicts in the testimony, weighed the evidence, and drawn reasonable inferences therefrom. *Id.* at 319. Accordingly, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326; *McDaniel v. Brown*, 558 U.S. 120, 133 (2010).

Because Petitioner challenges his conviction for aiding and abetting murder, the Court now turns to the substantive elements of that offense under state law. In California, a person aids and abets the commission of a crime when he acts (1) with knowledge of the unlawful purpose of the perpetrator, and (2) with the intent or purpose of committing encouraging or facilitating the commission of the crime, and (3) by his act or advice, he

aids, promotes, encourages, or instigates the commission of the crime. CALJIC No. 3.01. The defendant need not be present at the scene of the crime to be convicted of aiding and abetting. *Id. See also People v. Beeman*, 35 Cal.3d 547, 561 (Cal. 1984).

It is not sufficient to meet the elements of the offense of aiding and abetting murder if the aider and abettor acted with knowledge of the criminal purpose of the perpetrator, but merely negligently or accidentally aided the perpetrator's commission of the crime. *Beeman*, 35 Cal.3d at 560-61. The evidence must show that the aider and abettor also had the *intent or purpose* to encourage or facilitate the commission of the crime. *Id.* at 560. The law does not conclusively presume the intention of the accused solely from his voluntary acts. That said, since "[d]irect evidence of the mental state of the accused is rarely available except through his or her testimony[,]" proof of the aider and abettor's intent may be made by way of an inference from his volitional acts with knowledge of their probable consequences. *Id.* at 558, 559-60. "Thus, an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose." *Id.* at 559. *See also People v. Pre*, 11 Cal. Rptr. 3d 739, 743 (Cal. Ct. App. 2004) ("Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense").

Notably, the prosecution presented two theories to the jury to support the charge of murder against Petitioner: that Petitioner aided and abetted the murder, and/or that Petitioner was guilty of conspiracy to commit murder. The jury found Petitioner guilty of the crime of murder in the first degree, and were not required to specify on the verdict form whether they reached this verdict based on the theory that he aided and abetted the murder or that he was a conspirator to the murder, or both. Lodg. 948. Thus, to the extent the jurors convicted Petitioner of first-degree murder as a co-conspirator, the elements of that crime are: (1) that Petitioner intended to agree and did agree with one or more people to commit murder; (2) at the time of the agreement, Petitioner and one or more of the other members of the conspiracy intended that one or more of them would commit the murder; and (3) that

Petitioner, his co-defendant Mr. Chambers, or any other unknown co-conspirator committed at least one overt act towards accomplishing the murder. CALCRIM No. 563. Direct evidence is not required to prove conspiracy; rather, an agreement to commit murder may be inferred from conduct, as long as the members of the alleged conspiracy acted with a common purpose to commit the crime. *See People v. Buckman*, 8 Cal. Rptr. 765, 770-71 (Cal. Ct. App. 1960) ("[D]irect evidence is not required to prove a common unlawful design and agreement to work toward a common purpose; the existence of a conspiracy may be inferred as well from circumstantial evidence. . . . It need not be shown that the parties entered into a definite agreement, but it is sufficient that they tacitly came to an understanding to accomplish the act and unlawful design[,] and such agreement may be inferred from the acts and conduct of the parties in mutually carrying out a common purpose in violation of the Statute.") (internal citations omitted). A member of a conspiracy need not personally know the identity or role of all other members, or all the details of the crime. *Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947); *see also Peskin v. Squires*, 319 P.2d 405, 409 (Cal. Ct. App. 1957) ("Each party to a conspiracy is liable for all acts done in pursuance thereof and his lack of knowledge of details or an absence of personal commission of overt acts is immaterial."). However, someone who merely accompanies or associates with members of a conspiracy, but who does not intend to commit the crime, is not a member of the conspiracy. CALCRIM No. 563.

Before the jury could find Petitioner guilty of first-degree murder on the basis that he either aided and abetted first-degree murder or was a member of a conspiracy to commit first-degree murder, they also had to find all elements of the crime of first-degree murder were met. The elements of murder are: (1) the perpetrator committed an act that caused the death of another person; (2) when the perpetrator acted, he did so with malice aforethought; and (3) the perpetrator acted willfully, deliberately, and with premeditation.  CALCRIM No. 521.

Most importantly, when reviewing a sufficiency of the evidence argument on federal habeas review, the Court must again keep in mind that habeas relief is only available to

Petitioner if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or were based on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2). And again, in conducting its review, the Court must "look to the last reasoned state-court decision" from the California Court of Appeal. *Farmon*, 347 F.3d at 738.

      *ii.*    *Analysis*

On appeal, the state court rejected Petitioner's sufficiency of the evidence argument based on the following analysis:

> Guthrie argues reversal is required because the prosecution failed to present sufficient evidence to support the conviction under either [the aiding abetting or the conspiracy] theory. Guthrie asserts the Attorney General can only point to five types of evidence, none of which establish his involvement in Canady's murder: (1) Guthrie's pretrial statements to police, (2) Guthrie's relationship with Grant, (3) Guthrie's knowledge of Grant's motive to murder Canady, (4) Guthrie's presence near the murder scene, and (5) Guthrie's contacts with Johnson in the time surrounding the murder. Guthrie's characterization of the evidence as insufficient, however, is not supported by the record before this court.

> As Guthrie argues, his close relationship with Grant and his knowledge of the motive and the crime, standing alone, do not establish his involvement in the crime. Other facts, however, are sufficient to support the jury's verdict. This evidence included the cell phone records placing Guthrie at the scene the day before the murder, cell phone records showing Guthrie was on the phone with Johnson seconds before the shooting and seconds after Canady is seen on the video surveillance footage coming outside of the barbershop (confirming his presence there), records showing Guthrie on the phone with Johnson shortly after the shooting and showing his movement away from the scene at the same time Johnson was moving away, and video footage of a man meeting Guthrie's physical characteristics and shadow boxing serving as lookout and support for Johnson at the scene.

> As Guthrie notes, the 'prosecution's case hinged on its ability to prove [Guthrie] was one of the two men in front of Nu's Auto Repair.' Viewing the evidence before the jury—particularly the cell phone records and video footage—in the light most favorable to the judgment, there was sufficient

evidence to support the jury's finding that Guthrie was one of those men. In addition, Guthrie's assertions (1) that the evidence against him was only circumstantial and (2) that circumstantial evidence alone cannot be sufficient as a matter of law are both inaccurate. The cell phone records constituted direct evidence of Guthrie's communications with Johnson at the scene of the murder. (See Evid. Code, § 410 [" 'direct evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact"].)

Further, that the verdict rested on circumstantial evidence does not warrant reversal. "'[T]he appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"' [Citation.]' . . .

While no witness confirmed that one of the two accomplices seen in the video surveillance footage was Guthrie, the video footage combined with the cell phone evidence showing Guthrie's involvement with Johnson (and to a lesser extent the testimony that Guthrie was a former boxer), amply supported the inference that Guthrie was one of Johnson's accomplices. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" '[A]mong the factors which may be considered in making the determination of aiding an abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' "].) In sum, there was sufficient evidence to support the jury's finding that Guthrie knowingly and willingly participated in the murder of Canady.

*Johnson*, 243 Cal. Rptr. 3d at 614-16.

The undersigned agrees that, viewing the evidence presented at trial in the light most favorable to the prosecution, a rational trier of fact could have found the elements of either aiding and abetting murder or conspiracy to commit murder to have been met beyond a reasonable doubt. Accordingly, the Court should find that the California Court of Appeal's

rejection of Petitioner's argument was reasonable and affords no basis for habeas relief under § 2254(d).

Petitioner argues that the prosecution's case "rested almost entirely on circumstantial evidence[,]" including video footage of extremely poor quality, cell tower evidence, and Petitioner's relationship to Grant. ECF No. 1 at 7. Petitioner argues that this evidence does not withstand due process scrutiny. *Id.* However, as discussed by the state appellate court, the fact that the prosecution's case relied substantially or even entirely on circumstantial evidence does not render the guilty verdict constitutionally unsound. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986)).

Additionally, during the trial, the jury saw and heard ample evidence that Petitioner conspired with Grant, Chambers, and unknown co-conspirators to commit the murder and that he aided and abetted in the crime, which the Court will summarize here.

First, video footage supported the jury's verdict. The jury watched video footage from three different angles of the minutes leading up to and during the shooting. One angle came from cameras belonging to a business located across the street from the barbershop where the shooting took place, Nu's Auto Shop. Another set of video footage came from inside the Tradewinds liquor store next door to the barbershop, and a third angle came from a residential home nearby. *See* Lodg. 3410-80. The Nu's footage showed a silver vehicle pull up and park across the street, and two men exited the vehicle. One of the men was wearing a teal shirt, and another was wearing khaki pants. Just after the two men exited the vehicle, another man wearing an American Eagle t-shirt—later identified as Dion Chambers, who committed the shooting—entered the frame, walking westbound down the street. Lodg. 3474-75. Chambers entered the Tradewinds liquor store next door to the barbershop, while the other two men stayed outside near the car. Lodg. 2028-2030. At one point, the man wearing a teal shirt engaged in what was described as a "shadow-boxing type of movement." Lodg. 3476. At 11:22:27, the Nu's footage showed the murder victim

Lamar Canady come out of the barbershop for a few seconds. Lodg. 3444-45. The liquor store footage showed Chambers receive a phone call at 11:23:01, and the call was terminated at 11:23:19. Lodg. 2056-57. Immediately following this phone call, the liquor store footage showed that Chambers purchased beer and left the liquor store at 11:24:44. Lodg. 3455. Beginning at 11:25:00, the Nu's footage showed the man wearing the teal shirt open the trunk of the vehicle and then get into the driver's seat. Lodg. 3459-60. During this same time period, Nu's footage showed the man wearing khaki pants go to the trunk of the silver vehicle and then proceed to cross the street to meet Chambers on the other side, at which point he took the liquor store bag containing beer from Chambers. Lodg. 2102; 2871; 3464-66; 3641-42. During closing argument, the prosecution used this footage to argue that Petitioner opened the trunk so that the man wearing khaki pants could retrieve the murder weapon—a loaded Glock handgun—from the trunk and hand it off to Chambers while taking the beer from him. *See* Lodg. 3764. At 11:25:35, one of the liquor store cameras showed Chambers walked into the barbershop, while the man in khaki pants returned to the silver vehicle, closed the trunk, and climbed into the passenger seat, still holding the bag of beer from the liquor store, which the prosecution argued was an indicator that the trunk had been opened for the purpose of retrieving something for the exchange with Chambers, rather than to place the beer inside afterwards. Lodg. 3465; *see also* Lodg. 4017-18. A few seconds later, Chambers proceeded to shoot and kill Canady in the barbershop and was seen on the footage exiting the barbershop at 11:25:41. Lodg. 3466. At 11:26 a.m., the video showed the vehicle pull away from the curb and drive away eastbound, but approximately one minute later, the vehicle returned and drove westbound back in front of the cameras, appearing to slow considerably as it approached the barbershop. Lodg. 3468-70.

Second, cell phone records and surveillance evidence supported the jury's verdict. The jury heard extensive evidence regarding a cell phone "tower dump" that assisted investigators in identifying Chambers as the shooter and Petitioner as the man in the teal shirt at the crime scene. A crime analyst named Peter Villaver testified that because the

footage showed Chambers answering his phone in the liquor store at approximately the same time as the man in the khaki pants was on the phone, investigators decided to conduct a "tower dump" to try to determine the phone numbers associated with the cell phones being used by the men at the crime scene.[5] According to Mr. Villaver's testimony, a tower dump is a process by which investigators collect all the data from cell phone towers providing coverage to cell phones in a particular vicinity, which the investigators hoped to use to identify the phone numbers that were involved in the phone call captured on the surveillance footage. Mr. Villaver explained in great detail how the tower dump allowed them to narrow down over 18,000 cell phone transactions that took place in the vicinity of the shooting between the hours of 11 a.m. and noon to a single phone call between two specific phone numbers identified as 619-577-0114 and 832-885-1563. Lodg. 2030-71; 2109-2117. Later investigation established that the 832 number belonged to Chambers. Video footage from inside the liquor store showed that Chambers received a phone call at 11:23:01, and the call was terminated at 11:23:19. Lodg. 2056-57. Cell phone records associated with these two target numbers showed that the 619 number made an outbound call to the 832 number that lasted approximately 18 seconds beginning at 11:22:59, which Mr. Villaver explained was the only call from the tower dump that matched the timing of Chambers' call in the liquor store. Lodg. 2137-38. Significantly, this phone call to

---

[5] Initially, investigators believed that the other person on the 11:23 a.m. call with Chambers was the man in the khaki pants, which was their working theory at the time they sought cell phone records through the tower dump. Lodg. 2030-32. However, by the time of trial, the prosecution had abandoned that theory in light of evidence from the tower dump, synchronized with the video footage, that the phone call involving the man in khaki pants took place about 30 seconds after Chambers received the call in the liquor store from the 619-557-0114 number. Lodg. 2204-07. At trial, the prosecution's theory was that Petitioner was the man in the teal shirt, and he is the one who made the phone call to Chambers at 11:23 alerting him that he had just seen Mr. Canady briefly exit and re-enter the barbershop. Lodg. 3762-63.

Chambers' cell phone was placed immediately after Mr. Canady appeared in the doorway of the barbershop at 11:22 a.m. Lodg. 3444.

Further analysis of cell phone records showed that these two numbers called each other more than 20 times beginning the day before the murder and up to the day after the murder, and the 619 number was a prepaid (burner) phone purchased at Wal-Mart only four days before the murder. Lodg. 2133-36, 2151-58. Similarly, Chambers' phone with the 832 number was purchased under a fake name the day before Chambers left Houston for San Diego on April 15, 2014, and the first contact in the phone was the 619 number later identified as belonging to Petitioner. Lodg. 3288-89. The first phone call between the two phones took place on the day before the murder. Lodg. 2124-33. The shooting took place at 11:25 a.m., and the 619 number engaged in active calls at 11:22, 11:23 and 11:26, all in the area of the murder, and it also engaged in transactions in the same area the day before the murder. Lodg. 2161-62.

Once investigators had identified the 619-577-0114 number as belonging to the other person on the phone call with Chambers two minutes before the murder, the FBI tracked the number using a pen register trap and trace and in-person surveillance techniques, allowing them to match real-time observations of Petitioner using his cell phone to the pen register records for that phone number. Lodg. 2344-62. Specifically, FBI agents surveilled Petitioner going into and out of a home at 9881 Via Monzon, where Petitioner was ultimately arrested during the execution of a search warrant. Lodg. 2570-71; 2997-3026. The jury heard evidence that the Via Monzon residence was used as a marijuana stash house for Omar Grant's marijuana trafficking operations, that Petitioner lived there, and that Grant considered Petitioner his "family." Lodg. 2742-46; 3004-26. Nine cell phones were found in the home, including Petitioner's phone in the nightstand with his fingerprints on it. Lodg. 3012-14. Petitioner confirmed in the interview with detectives that the phone with the 619-577-0114 number found at the Via Monzon residence was his phone, that he purchased it at Wal-Mart, and that no one else used it. Lodg. 166-70. Detectives also found a box in the home with a number of fake IDs inside, including four ID cards for Petitioner

with two different names. Lodg. 3025-26. Petitioner gave a false name to arresting officers. Lodg. 2570-71.

The jury also heard evidence from Omar Grant's ex-girlfriend, Talya Martin, who was central to Mr. Grant's motive for the murder because approximately two years before the murder, Mr. Canady slept with Ms. Martin and stole a large amount of marijuana from Mr. Grant that had been stored at Ms. Martin's home. Lodg. 2737-57; 2776. Ms. Martin testified about a cell phone found at the Via Monzon residence containing entries for "RZ," "BXR," and "TAL" in the contacts list. Lodg. 2838-39. *See also* Lodg. 3298-301 (testimony from crime scene investigator establishing where the phone was found). Ms. Martin confirmed that "RZ" was Omar Grant, "BXR" was Petitioner, and "TAL" was herself. Lodg. 2838-39. Based on that testimony, Mr. Villaver was asked to compare the phone numbers associated with the entries for Omar Grant ("RZ") and Petitioner ("BXR")[6] in that cell phone with the data from the tower dump. Mr. Villaver's analysis showed that at 11:18 a.m. on May 9, 2014, approximately seven minutes before the shooting, the phone numbers identified as belonging to Petitioner and Mr. Grant engaged in a 56-second phone call. Lodg. 3648-51. Other cell phone records showed a total of six transactions between Mr. Grant's and Petitioner's cell phones on the day of the murder, although only the 11:18 a.m. call appeared in the tower dump. Lodg. 3652-53.

Third, as touched on above in the description of the search of the Via Monzon residence, the numerous fake identification documents were a key piece of evidence showing a connection between Petitioner, Chambers, and Grant. Jurors heard evidence showing that Chambers and Petitioner had obtained fraudulent Florida State driver's licenses and other falsified identification documents from the same source. During the

---

[6] The phone number in the contacts list associated with Petitioner was different from the 619-577-0114 number that was also associated with him and used to confirm his location and identity after the shooting. Indeed, the phone number for Petitioner in the phone found at the Via Monzon residence was only one digit off from Grant's phone number, indicating the burner phones were bought in the same batch. Lodg. 2838-39.

surveillance of the Via Monzon residence, San Diego Police Sergeant Van Cruz saw Petitioner driving away from the home and followed him by car to the post office. Lodg. 2420-23. Detectives were then able to identify Petitioner as "Devon John" from the label on the box he sent from the post office, which was mailed to Jamaica. Lodg. 2423-24. They learned from investigators in Florida that "Devon John" was the subject of an investigation into fraudulent ID cards, including the one with that name. Lodg. 2425-26. When surveilling Petitioner on a later date, investigators instructed uniformed officers to conduct a traffic stop. Lodg. 2427-30. *See also* Lodg. 2450-55. Petitioner's license indicated he was "Devon John," and the officer who conducted the traffic stop identified Petitioner in court as the person he pulled over. Lodg. 2450-55.

In related testimony, Florida Highway Patrol Officer Spencer Ross testified that the "Devon John" driver's license was one that had been issued fraudulently by a corrupt employee of the Florida tax collector's office. Lodg. 2474-76. Officer Ross contacted Sergeant Cruz when the Devon John license was run. Lodg. 2479-80. From there, Officer Ross reviewed the underlying Virgin Islands documents submitted to obtain the Florida "Devon John" license, including the Virgin Islands driver's license. From this investigation, Officer Ross explained that they were able to identify several different unique characteristics that kept appearing in this particular fraud in the driver's licenses, including misprinted lines in the same place and similar backgrounds behind the photos that did not match the backgrounds on genuine Virgin Islands licenses, as well as similar discrepancies among the false birth certificates, e.g., that they were issued the same day as the birth, which was never actually done in the Virgin Islands. Lodg. 2479-88. Chambers used a "Derrick Brown" Florida driver's license that was supported by similar fake underlying documents, including a Virgin Islands driver's license, birth certificate, and supporting documentation. The driver's licenses bore the same inaccurate photo background colors, as well as the same printing flaws indicating they were printed on the same printer. Additionally, the two men's fake Virgin Islands birth certificates listed the same city and island of birth, the same mother's first name, and the same doctor's signature.

Lodg. 2488-97, 2623. This evidence tended to show that Chambers and Petitioner obtained their fake IDs from the same source, and Ms. Martin also testified about Grant providing her with fake IDs. Lodg. 2739-40.

Fourth, jurors saw Petitioner's interview with homicide detectives, where he admitted being in contact by phone with Chambers on the day of the shooting, admitted to being in the general vicinity of the murder, and informed them of Omar Grant's name and his motive for planning the murder. Lodg. 162-65; 206-18; 222-42. Jurors were able to gauge his general demeanor and credibility from watching the interview, including that he withheld a significant amount of information and lied repeatedly before eventually providing the information about Grant's identity and motive, which were later corroborated by investigators. Ms. Martin's testimony also corroborated Petitioner's description of Grant's motive for the murder as well as other information that Petitioner gave detectives during his interview, such as Grant's nickname "Razor," indicating that Petitioner had inside knowledge. Lodg. 2748-57. Although Petitioner indicated in his interview with detectives that he did not know Grant well, Ms. Martin testified that she, Grant, her friend Claudia, and Petitioner all spent time together at least twice a week during the May 2014 time period when the murder occurred. Lodg. 2762-63. The jury also saw photos and videos of Petitioner with Grant, Ms. Martin, and Claudia, establishing that they were friends. Lodg. 2958-60. Ms. Martin's testimony also established that Petitioner's nickname was "Boxer" because he used to be a boxer, which the prosecution used to support the inference that Petitioner was the man in the teal shirt seen shadow-boxing on the Nu's video footage. Lodg. 2746; 2798.

The evidence outlined above is sufficient for a reasonable jury to find that Petitioner aided and abetted the first-degree murder of Lamar Canady. "[N]either presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." *People v. Campbell*, 30 Cal. Rptr. 2d 525, 529 (Cal. Ct. App. 1994). However, as noted by the California Court of Appeal in this case, "among the factors which may be considered in making the determination of aiding and abetting are: presence

31

at the scene of the crime, companionship, and conduct before and after the offense." *Id.* (quoting *In re Lynette G.*, 126 Cal. Rptr. 898, 902 (Cal. Ct. App. 1976)). The jury could reasonably have found that the cell phone records established that Petitioner planned the murder with Chambers and Grant, based on dozens of calls placed between Petitioner and each of those two men the day before and in the hours and minutes leading up to the murder and immediately after the murder. The jury could have reasonably found that contemporaneous video footage showed Petitioner assisted Chambers at the scene of the crime by acting as a lookout and calling Chambers to alert him that the target was in place after seeing Canady appear in the doorway of the barbershop and go back inside, after which Chambers left the liquor store to commit the murder. The jury could have also reasonably inferred from the video footage and phone records that Petitioner was involved in supplying the murder weapon to Chambers from the trunk of the vehicle he was driving, that he drove by the barbershop after the murder to confirm Canady was dead, and that he then called Grant with that information. Other evidence tended to establish that he had a close relationship with Grant and had inside knowledge regarding the motive for the murder.

Based on this evidence, a reasonable jury could have found all four elements of aiding and abetting first-degree murder met. That is, the jury could have found (1) that Chambers committed first-degree murder by willfully and deliberately causing the death of Lamar Canady with malice aforethought, (2) that Petitioner knew Chambers intended to commit the murder, (3) that before or during the commission of the murder, Petitioner intended to aid and abet Chambers in committing the murder, and (4) that Petitioner's conduct did in fact aid and abet the commission of the murder. *See* CALJIC No. 3.01. Alternatively, a reasonable jury could have found Petitioner guilty of first-degree murder as a co-conspirator, on the basis that: (1) Petitioner intended to agree and did agree with one or more people to commit murder; (2) at the time of the agreement, Petitioner and one or more of the other members of the conspiracy intended that one or more of them would commit the murder; and (3) that Petitioner, Chambers, or any other unknown co-

conspirator committed at least one overt act towards accomplishing the murder. *See* CALCRIM No. 563; Cal. Penal Code § 182.

Therefore, the California Court of Appeal's rejection of Petitioner's argument that the evidence was insufficient to establish his guilt as a matter of due process was based on a reasonable application of law and a reasonable determination of the facts, in light of the evidence presented in the state court proceeding. There is thus no basis to afford habeas relief to Petitioner pursuant to § 2254(d) on this ground.

### C.   Grounds 3 and 4: that the trial court erred by admitting certain evidence at trial

In Grounds 3 and 4 of the Petition, Petitioner argues that the trial court erred by admitting certain evidence at trial, namely, (1) evidence of Petitioner's status as an undocumented immigrant and his uncharged criminal conduct of using false identification documents to enter the United States and engaging in a marijuana distribution operation; and (2) evidence of rap lyrics written by the murder victim. It is appropriate for the Court to address Grounds 3 and 4 together, because they are governed by the same legal standard.

> *i.   Legal Standards*

"A state trial court's evidentiary rulings do not provide grounds for federal habeas relief unless 'the alleged errors rise to the level of a due process violation.'" *Scott v. Diaz*, 584 F. App'x 509, 511 (9th Cir. 2014) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). *See also Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."). "Simple errors of state law do not warrant federal habeas relief." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

Under § 2254(d), "even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court. In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable." *Id.* (quoting 28 U.S.C. § 2254(d))

(other citation omitted). The Supreme Court "has made very few rulings regarding the admission of evidence as a violation of due process[,]" and it "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* Therefore, even if the Court finds that the trial court erroneously admitted irrelevant or overtly prejudicial evidence, it nonetheless may not issue habeas relief unless the erroneous admission was forbidden by clearly established federal law, as laid out in a Supreme Court holding. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (explaining that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision").

### ii.   Analysis

Petitioner first contends that the introduction of evidence regarding the uncharged offenses of identity fraud and illegal immigration was unduly prejudicial. He avers that the evidence showing he "was an illegal immigrant who crossed into the United States [] using fraudulent documents to engage in yet more illegal activity via a high-profit marijuana distribution operation" could have diluted the jury's presumption of innocence, arguing, "[a] concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is." ECF No. 1 at 8 (quoting *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977) and citing *People v. Garceau*, 862 P.2d 664, 690-91 (Cal. 1993)). In support of this ground, Petitioner attaches portions of his appellate briefing to the Petition, in which he argued that the prosecution failed to create a reliable evidentiary link between Petitioner and the murder of Canady. ECF No. 1 at 22-23. Absent such link, he argues, "there could be no fact upon which a rational jury could infer a conspiratorial express or implied agreement to kill. All the jury knew is that [Petitioner] is a bad person because [] he is in the United States illegally and has no problem engaging in identity theft." *Id.* at 23.

Rejecting Petitioner's argument on this ground under an abuse-of-discretion standard, the California Court of Appeal found it clear from the record "that the trial court considered the potentially prejudicial effect of the evidence and limited the presentation of

that evidence to minimize its inflammatory character. Further, the prosecution did not use the defendants' immigration status to insinuate criminal proclivity or challenge the defendants' credibility." *Johnson*, 243 Cal. Rptr. 3d at 605. The court further noted that there was "no dispute" that the evidence showing the defendants "obtained false identification through the same fraudulent channel [] was relevant to show Johnson and Guthrie were part of the conspiracy with Grant to murder Canady." *Id.* Therefore, the Court of Appeal held that "the trial court did not abuse its discretion by finding the evidence's probative value was not substantially outweighed by any potential prejudicial effect." *Id.*

The undersigned agrees that the evidence related to Petitioner's uncharged offenses of identity fraud and illegal immigration was relevant, because it established a link between Petitioner and Chambers, and to a lesser extent to Grant due to other evidence showing he was involved in obtaining fake identification cards. Therefore, the California Court of Appeal reasonably found that the trial court did not abuse its discretion by finding the evidence's probative value was not substantially outweighed by its prejudicial effect. More importantly, even if the Court found that the admission of this evidence was erroneous, Petitioner would still not be entitled to federal habeas relief unless he could show that the admission of the evidence violated his due process right to a fair trial under clearly established Supreme Court precedent. *Estelle*, 502 U.S. at 70; *Sublett*, 63 F.3d at 930; 28 U.S.C. § 2254(d)(1). He has not done so. Accordingly, the Court should reject this ground for habeas relief.

Next, Petitioner contends that the trial court erred by admitting irrelevant and unduly prejudicial evidence of rap lyrics written by the murder victim Lamar Canady. The trial court granted the prosecution's motion to admit evidence of these lyrics, "to the effect that he had stolen marijuana worth $250,000 from [] Omar Grant, and uncharged co-conspirator who the prosecution contends ordered the killing, and that he had slept with Grant's girlfriend, Talya Martin." Lodg. 461. The prosecution contended that the statements should be admitted as declarations against interest and to provide evidence of motive and identity of the perpetrators. *Id.*

At the appellate level, Petitioner argued that the rap lyrics "were unduly prejudicial because they were unquestionably irrelevant and alternately, had very little effect on any material disputed issue in this case, but added one more building block in the State's case against Guthrie[,]" and that they "inject[ed] inflammatory, untrustworthy considerations into the weighing process." ECF No. 1 at 24-25. The California Court of Appeal rejected this argument, explaining:

> The lyrics were relevant to the prosecution's theory of the case, particularly the defendants' motive to seek revenge for Canady's theft and relationship with Martin. The lyrics tended to show that Canady was engaged in conduct that could provoke retaliation by Grant. Specifically, Canady's lyrics included statements about making money by selling drugs stolen from a girl who could not be trusted and that the theft was from "rude boys" and "Jack boys," slang parlance for Jamaicans. A trial court has wide latitude to admit evidence relevant to motive (People v. Gonzalez (2005) 126 Cal. App. 4th 1539, 1550, 25 Cal. Rptr. 3d 124) and Canady's lyrics did not fall outside this broad discretion.
>
> Further, Guthrie has not explained why the lyrics were inflammatory or prejudicial to his defense, instead focusing narrowly on the relevance of the lyrics and their ambiguity. Thus, even if the evidence's probative value was relatively low, Guthrie has failed to show that their relevance was outweighed by the probability of prejudicial effect.

*Johnson*, 243 Cal. Rptr. 3d at 617-18.

The undersigned agrees that Petitioner failed to show that admission of this evidence was erroneous or that it was prejudicial to his case. The California Court of Appeal reasonably found that the lyrics were relevant to the prosecution's theory of the case, because they "tended to show that Canady was engaged in conduct that could provoke retaliation by Grant." *Johnson*, 243 Cal. Rptr. 3d at 617.

Moreover, it is not clear how this evidence had any prejudicial effect on Petitioner. Indeed, at trial, the primary party who relied on the evidence of Canady's rap lyrics was not the State, but rather Petitioner's co-defendant, Chambers, whose counsel elicited testimony about the lyrics during trial and later used this evidence in his closing argument to cast doubt on whether Chambers was the shooter, suggesting that Canady may have been

killed by another West Coast Crips gang member who was in the barbershop at the time of the shooting. *See* Lodg. 2649-63; 4044-46. Had the jury agreed that Chambers was not the shooter and that Canady may have been targeted by a different member of the West Coast Crips because his lyrics put a "target on their back," as Chambers' counsel argued, Lodg. 4045, such a finding would have only served to weaken any inference that Petitioner was involved in the murder. And, again, even if the Court were to find that the admission of this evidence was erroneous, that would not be enough to grant habeas relief. Federal courts on habeas review are "not at liberty to depart from the state appellate court's resolution of [] issues of state law" and are confined to determining questions of federal law. *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 629 (1988). Therefore, habeas relief would only be warranted here if there was "clearly established Federal law" showing that admission of such evidence "rendered the trial fundamentally unfair in violation of due process." *Sublett*, 63 F.3d at 930; 28 U.S.C. § 2254(d)(1). There is none.

For these reasons, the undersigned recommends that the Court find that Petitioner has failed to show that the state court's evidentiary rulings "resulted in a decision contrary to, or that involved an unreasonable application of, clearly established Federal law," as needed to justify habeas relief under § 2254(d)(1).

### D. Ground 5: that the cumulative prejudice of the errors raised in Grounds 1-4 amount to a denial of due process

Lastly, Petitioner seeks habeas relief on the ground that the cumulative prejudice of the errors he raises deprived him of his right to a fair trial. ECF No. 1 at 9. Even if no single error is prejudicial, "where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal." *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996) (internal quotations and citation omitted). "Under traditional due process principles, cumulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In other words, "where the combined effect of

individually harmless errors renders a criminal defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates due process." *Parle*, 505 F.3d at 927 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 302-03 (1973)) (alteration in original).

The Court should reject this claim as well, on the basis that Petitioner has failed to establish any constitutional violation in the first instance. As Defendants discuss in their Answer to the Petition, "[r]elief for cumulative prejudice necessarily presupposes that the Court will find substantial error occurred in connection with at least two of the petitioner's claims." ECF No. 13-1 at 26. (citing *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"). *See also Reynolds v. Smith*, 124 F.3d 212 (9th Cir. 1997) ("Because we hold that there were no constitutional violations during [the habeas petitioner's] trial, there is no reason to reverse for cumulative error.").

Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis that the cumulative prejudice of multiple errors resulted in a conviction in violation of due process. Petitioner has failed to establish any constitutional errors in the state court proceedings below.

## IV.   CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that all grounds raised in the Petition for habeas relief pursuant to 28 U.S.C. § 2254(d) should be rejected, and the Petition should accordingly be denied.

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that the Petition for Writ of Habeas Corpus (ECF No. 1) be **DENIED**.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **July 13, 2023**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **July 20, 2023**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  June 22, 2023

_____
Honorable Allison H. Goddard
United States Magistrate Judge